J-A02001-19
J-A02002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.J.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A., STEP MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 893 MDA 2018 |

Appeal from the Dispositional Order Entered May 10, 2018
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000124-2017

\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: L.J.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 933 MDA 2018 |

Appeal from the Dispositional Order May 10, 2018
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000124-2017

BEFORE:  LAZARUS, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 21, 2019**

Appellants A.A. (Stepmother) and J.S.A. (Father) each filed an appeal

from the order, entered in the Court of Common Pleas of Cumberland County,

adjudicating L.J.A. (Child) (DOB 8/11) dependent, requiring legal custody be

shared among M.M. (Mother), Father, and Cumberland County Children and

Youth (the Agency), and granting Mother and Father shared physical custody. This dependency matter stems from a contentious custody battle between Mother and Father. After our review, we affirm, based, in part, on the trial court opinions authored by the Honorable N. Christopher Menges.[1] *See* Trial Court Opinion, Appeal of J.S.A., 7/13/18; Trial Court Opinion, Appeal of A.A., 7/13/18.[2]

Between April and August of 2017, the Agency received six referrals from Father naming Child as the victim of abuse and identifying Mother as the alleged perpetrator. Five of the referrals were deemed unfounded; the sixth, which identified someone with whom Mother associates as the alleged perpetrator, is the subject of this appeal.

The Agency scheduled home visits, and the Agency caseworker observed Child in both Mother's home and Father's home. According to the caseworker's observations, Child appeared comfortable in both homes.

In August, the Agency caseworker made a scheduled visit to Child at Father's home. The caseworker saw "circular red marks" on Child's back. Child told the caseworker she had fallen at daycare, however, Father and

_____

[1] Because Father is a practicing attorney in Cumberland County, President Judge Edward E. Guido appointed an out-of-county judge, Judge Menges, to preside over the dependency hearing. Notably, Father is the Court Appointed Mental Health Attorney for Cumberland County.

[2] The Guardian *ad litem* has not filed a brief and relies upon the trial court's opinion.

Stepmother insisted the marks were not from a fall but, rather, were similar to "injuries" precipitating the prior referrals.

After a shelter care hearing on August 31, 2017,[3] Child was placed with paternal grandfather and step-grandmother. After several continuances, an amended dependency petition, and four adjudicatory hearings held between September 2017 and May 2018, the court adjudicated Child dependent. The Agency presented expert testimony from Valentins Krecko, M.D., a board certified child and adolescent psychiatrist. Dr. Krecko opined that Child's recent behavioral issues, aggression toward animals and babies, was a result of emotional abuse stemming from the custody battle. N.T. Adjudicatory Hearing, 4/18/18, at 31-34.

The court found that "Father has coached the child to go along with his fabricated theories. [Child] stated to her grandmother that Father had lied about her being hit with a hammer [by Mother]." Trial Court Opinion, Appeal of J.S.A., *supra* at 14. The court also found that "Father has created a mountain of documentation, which he intends to use as a weapon in the custody battle." *Id.*

The court entered a disposition order that same day, finding Child dependent and requiring legal custody of Child be shared among Mother, Father and the Agency; the court also ordered physical custody of Child be

_____

[3] We note the typographical error, 2018 instead of 2017, on page 3 of the trial court's opinions with respect to the date of the shelter care hearing.

returned to Mother and ordered Father have unsupervised visitation.[4]   The

order further provided:

> The Court hereby finds that the Child is a victim of child abuse as defined at 23 Pa.C.S. § 6303, in that [Father] and [Stepmother] are found to have been the perpetrators of emotional abuse/serious mental injury[.]

Order, 5/10/18.

Father and Stepmother filed separate appeals from the order, which we

have consolidated *sua sponte*.  **See** Pa.R.A.P. 513.  Father raises the following

claims on appeal:

_____

[4] The Juvenile Act provides:

> (a) General rule.--If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:
>
> > (1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

42 Pa.C.S.A. § 6351(a).  Upon a finding of clear and convincing evidence that the child is dependent, the court is authorized to remove a child from the parents' custody, or to permit the child to remain with his or her parents subject to conditions.  **Id**.; **see also In interest of C.S**., 580 A.2d 418 (Pa. Super. 1990).

We note that neither party challenged the trial court's granting legal custody of Child to the Agency as well as the parents, and then ordering that Child return to Mother's home.  As a result, we do not have jurisdiction to address whether the Juvenile Act or the Juvenile Court Procedural Rules authorizes the trial court to grant legal custody to an agency as well as parents, especially when the court returns the child to one of the parents.

1. Were the due process rights of [Father] violated when the lower court made a finding of emotional abuse, when emotional abuse was not part of either of the two dependency petitions?

2. Did the lower court err as a matter of law or abuse its discretion in finding emotional abuse of the Child when CYS agreed that issue was part of a collateral proceeding and not part of the herein dependency petitions and the report of January 4, 2018 never having been served upon [Father]?

Father's Brief, at 4.

Stepmother raises the following claims on appeal:

1. Whether the lower court erred as a matter of law and or abused its discretion in its order dated May 10, 2018, finding [Stepmother] was a perpetrator of emotional abuse?

2. Whether the lower court erred as a matter of law or abused its discretion in its order dated May 10, 2018, finding [Stepmother] was given proper notice of the Agency's intention to pursue a finding of emotional abuse?

3. Whether the lower court erred as a matter of law or abused its discretion in its order dated May 10, 2018, that adjudicated Child dependent?[5]

4. Whether the lower court erred as a matter of law or abused its discretion in denying the motion to release Child from shelter custody?

5. Whether the lower court erred as a matter of law or abused its discretion in denying the motion to remove [Stepmother's] name as legal custodian or guardian of [Child]?

Stepmother's Brief, at 4.

_____

[5] In her brief, Stepmother noted that she no longer wished to pursue this claim on appeal. *See* Stepmother's Brief, at 4.

> Our standard of review in dependency cases is well established; the standard this Court employs is broad. We accept the trial court's factual findings that are supported by the record, and defer to the court's credibility determinations. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule [the trial court's] findings if they are supported by competent evidence.

*In re R.P.*, 957 A.2d 1205, 1211 (Pa. Super. 2008) (citations and quotations omitted). "Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate*." In re C.J.*, 729 A.2d 89, 92 (Pa. Super. 1999) (citing *In re Donna W.*, 472 A.2d 635 (Pa. Super. 1984) (en banc)). The trial court's decision should not be reversed merely because the record would support a different result. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

Father claims he was denied due process when the court made a finding of emotional abuse where the dependency petitions alleged physical abuse, and, further, that the January 4, 2018 psychiatric re-evaluation, upon which the Father claims the court's finding was based, was not entered into evidence or served upon Father. We find this claim meritless.

The Juvenile Act governs state intervention in the parent-child relationship. 42 Pa.C.S.A. § 6301 *et seq.* In *In re M.L.*, 757 A.2d 849, (Pa. 2000), our Supreme Court stated that a court

is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 850-51. *See also In re D.A.*, 801 A.2d 614 (Pa. Super. 2002) (en banc). The Juvenile Act defines a dependent child as one who:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, *mental, or emotional health*, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302 (emphasis added).

Father's argument is also meritless. The Agency filed an amended dependency petition on December 6, 2017. The amended petition alleged that Child was victim of abuse as defined at 23 Pa.C.S A. § 6303. Section 6303 defines child abuse as follows:

(b.1) Child abuse.—the term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

\* \* \* \*

(3) causing or substantially contributing to serious mental injury to a child though any act or failure to act or a series of such acts of failures to act.

23 Pa.C.S.A. § 6303(b.1)(3). Mental injury is, as pointed out by the Agency, synonymous with emotional abuse. Moreover, Father (and Stepmother) were both aware that Child was undergoing psychiatric evaluation, that the contentious custodial battle could cause mental injury to Child, and that Child's demonstration of aggression and behavioral issues could be symptoms of emotional abuse. Although Child's initial evaluation did not reveal "serious mental injury," Father's claim that he was not on notice of potential emotional abuse is implausible. **See** Report of Valentins F. Krecko, M.D., 9/21/17 ("[Child] is a 6-year-old girl who is embroiled in a bitter custody battle between her parents. Multiple allegations of physical abuse have remained unfounded. *Regarding the concern of emotional abuse*, while it is clear that the hostile and contentious relationship between [Child's] parents is not emotionally healthy, their hostility does not meet the State legal requirement that it be done `knowingly, intentionally, and recklessly.' In addition, psychiatric evaluation of [Child] *today* fails to reveal chronic or severe anxiety, depression, agitation, psychosis, or reasonable fear of harm. Thus, [Child] does not meet the State definition of a child with serious mental injury. . . [Child] is too young to take sides in her parents' custody dispute and should not be asked to do so.") (emphasis added). Although Dr. Krecko's evaluation of Child did not reveal serious mental injury at that time, Father was certainly on notice that this was a significant "concern." In fact, at the hearing three months later, on December 7, 2017, Dr. Krecko testified that he was asked to

perform the September 21, 2017 evaluation to determine whether Child had suffered emotional abuse as a result of the "high conflict" custody battle. N.T. Hearing, 12/7/17, at 55. He testified that 65% of children involved in these battles "will display clinical symptoms of anxiety severe enough to warrant therapy. The other potential risks include problems with attachment due to fear of abandonment or fear of being hurt, fears and phobias, physical aggression, sleep disorders, clinical depression, oppositional behavior, just to name some of them." *Id.* at 55-56. The court questioned Dr. Krecko as follows:

> Q: Dr. Krecko, you stated in your report and you testified today that you do not believe that [Child] has a serious mental injury, correct?
>
> A: Well, I said that on September 21st, and that was prior to being informed that she had actually developed some troublesome -- troubling aggression.
>
> Q: So, the fact that it's been reported that she has now experienced some troublesome aggression, does that change your opinion as you stated it back on September 21?
>
> A: I would have to change my opinion. I'd have to say that because [Child] is experiencing problems with self-control and with behavior that she is -- that she is experiencing evidence of serious mental injury.

*Id.* at 60-61.

We agree with the trial court that one "in [Father's] position is on notice that the issue of emotional abuse is, in fact, before the court." Trial Court Opinion, Appeal of J.S.A., *supra* at 7. *See supra* n.1; *see also Matter of C.R.S.*, 696 A.2d 840, 842 (Pa. Super. 1997) (purpose of dependency

- 9 -

adjudication is to correct situation in which children lack proper parental care and control necessary for their physical, mental or emotional health). In light of the foregoing, the trial court found, and we concur, that Father's claim of surprise at the February 14, 2018 hearing was disingenuous. After our review, we conclude that the record supports the court's findings, and we rely on Judge Menges' opinion to dispose of Father's claims. **See** Trial Court Opinion, **Appeal of J.S.A.**, **supra** at 5-9.

Stepmother raises four issues on appeal. **See** note 3, **supra**.[6] Stepmother's primary concern, in issues one and five, is that the Agency added her as "Custodian" in the December 6, 2017 amended dependency petition. **See** Amended Dependency Petition, **supra** at 1. She argues that she is neither a biological parent nor a legal guardian of Child, and, therefore, she should not have been found to be a "perpetrator of emotional abuse." Stepmother's Brief, at 13.

The trial court found "with absolute certainty" that Stepmother falls into the category of "other custodian," as contemplated by section 6302 of the Juvenile Act. Trial Court Opinion, Appeal of A.A., **supra** at 5. The record is

---

[6] The trial court states that a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal was not filed along with the notice of appeal in accordance with children's fast track procedure. **See** Pa.R.A.P. 905(a)(2) ("If the appeal is a children's fast track appeal, the concise statement of errors complained of on appeal as described in Rule 1925(a)(2) shall be filed with the notice of appeal and served in accordance with Rule 1925(b)(1)."). Our review of the record indicates that, in fact, a Rule 1925(b) statement was filed on June 1, 2018, simultaneously with the notice of appeal.

replete with evidence that Stepmother, whom Child refers to as "mama," is considerably involved in parenting Child when Child is in Father's custody, which was 50% of the time. Stepmother prepares meals, oversees homework, attends school functions and participates in Child's therapy sessions. N.T. Hearing, 2/14/18, at 66, 190, 192-93; N.T. Hearing, 5/10/18, at 43-44, 60, 62, 111. Stepmother acts as a co-parent and, based on our review of the record, the trial court properly characterized her as "other custodian."

The Agency made a *prima facie* case that Stepmother was one of the perpetrators of abuse; the burden then shifted to Stepmother to demonstrate that she was not a perpetrator. ***See In re L.Z.***, 111 A.3d 1164 (Pa. 2015). Stepmother failed to do so. Based on the evidence provided over the four hearings, the court found Father and Stepmother "acted in concert to make multiple allegations of abuse against Mother." Trial Court Opinion, Appeal of A.A., 7/13/18, at 13. After our review of the record, we conclude that the trial court's finding that Stepmother was a perpetrator of the abuse is supported by competent evidence, and we affirm based upon Judge Menges' opinion. ***See id.*** at 5-6.

Next, Stepmother's argument that she was not provided notice that emotional abuse was an issue that could be determined by the court at the April 18, 2018 adjudicatory hearing is, like Father's identical claim, meritless. ***See*** discussion above, ***supra*** at 6-10.

- 11 -

Finally, Stepmother claims that the court abused its discretion in denying her request to release Child from shelter care. We disagree. We refer Stepmother to the decision in ***In re Kerr***, 481 A.2d 1225 (Pa. Super. 1984) (juvenile held beyond period of time provided by statute can petition court for immediate release (which guardian *ad litem* did not, but Stepmother did), and if not released, can petition the Superior Court (which Stepmother did not)). Here, the court denied Stepmother's petition at the April 18, 2018 hearing. Stepmother did not petition this Court. Further, physical custody of Child has been returned to the parents, and thus this is not grounds to disturb the adjudication of dependency. ***See*** Pa.R.J.C.P. 1126 ("A child shall not be released, nor shall a case be dismissed, because of a defect in the form or content of the pleading or a defect in the procedures of these rules, unless the party raises the defect prior to the commencement of the adjudicatory hearing, and the defect is prejudicial to the rights of a party.").

We find no error or abuse of discretion. ***See In re R.P.***, ***supra***; ***In re C.J.***, ***supra***. The parties are instructed to attach the trial court's opinions in the event of further proceedings.

Order affirmed.

J-A02001-19
J-A02002-19

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/21/2019

Circulated 05/04/2019 02:55 PM

FILED

2018 JUL 13 PM 3: 25

CLERK O COURT
CUMBERLAND COUNTY PA

# IN THE COURT OF COMMON PLEAS OF CUMBERLAND COUNTY, PENNSYLVANIA
## JUVENILE DIVISION

|  |  |  |
|---|---|---|
| | : | |
| **In the Interest Of:** | : | **CP-21-DP-0000124-2017** |
| **L.J.A., A Minor** | : | |
| | : | **933 MDA 2018** |
| | : | |
| **Appeal of: J.S.A.** | : | |

---

## MEMORANDUM OPINION IN SUPPORT OF ORDER PURSUANT TO RULE 1925(a)(2)(ii) OF THE PENNSYLVANIA RULES OF APPELLATE PROCEDURE

**AND NOW,** this 20th day of June, 2018, the Court is in receipt of

Appellant's statement of errors complained of on appeal, as required by the Rules

of Appellate Procedure for a Children's Fast Track Appeal. Pa.R.A.P 1925(a)(2)(i).

The Court hereby reaffirms its Order of Adjudication and Disposition of February

1

12, 2018, adopts its Findings of the same day, as well as the Findings of September 7, 2017, and offers further discussion, below.

## HISTORY

L.J.A., six, is the natural born daughter of Justin Abel, Appellant (hereinafter "Father"), and Ms. Margaret Murphy ("Mother"). L.J.A. is also at the center of a contentious custody dispute which is the subject of litigation in Cumberland County, Pennsylvania. Between April and August of 2017, the Cumberland County Children and Youth Services Agency (CYS) received at least six referrals naming L.J.A. as a victim of abuse. Five specifically identified Ms. Murphy as the alleged perpetrator; one identified someone with whom Ms. Murphy associates as the alleged perpetrator. Father freely acknowledges having made the referrals. Five of the referrals were deemed unfounded. This appeal involves the sixth referral. On August 23, 2017, a CYS caseworker made a scheduled visit to see L.J.A. at Father's home. Present at the visit were Father, L.J.A., and Stepmother, Ashley Abel. At that time, the caseworker observed injuries on the child's back, which were described as "circular red marks." Dependency Petition ¶11 (Sept. 1, 2017). L.J.A. told the caseworker that she had fallen at daycare; she was not experiencing pain. However, Father and Stepmother insisted that the marks were not due to a fall.

2

CYS received a referral three days later on August 26, alleging that Mother was not feeding L.J.A. Another referral was received four days later on August 30, claiming that L.J.A. had disclosed that the circular red marks on her back were caused by Mother hitting her with a hammer. The following day, Mother met with the CYS caseworker. The caseworker attempted to engage Mother in a safety plan, including supervised contact. Mother did not agree that a safety plan was necessary; she provided time-stamped photographs taken the morning of August 23, the day of the alleged hammer injuries, showing L.J.A. without injuries, minutes before going to before school care. Id. ¶¶14-15. When asked why she would take such photographs, Mother reported that doing so was suggested to her by law enforcement officers during previous investigations to prove lack of injury before custodial exchanges.

A shelter care hearing was held August 31, 2018 and L.J.A. was placed in foster care.[1] CYS filed a Dependency Petition September 1, 2017, citing concerns not only of where the red circular injuries had come from, but also about the very contentious custody situation, and whether Father and Stepmother were pushing the child to talk about inappropriate things and coaching her. Id. ¶¶16-17. An adjudicatory hearing was held before a hearing officer on September, 7. Kinship

---

[1] Apparently it is the custom in Cumberland County to record shelter care hearings and produce transcripts from the recordings as needed. Unfortunately, the recording of the shelter care hearing in the instant case was lost, and no transcript is available.

caregivers were identified, and L.J.A. was placed with her paternal grandparents. Four adjudicatory hearings were held before this court over the course of the next nine months before a determination of dependency and a finding of abuse were entered on May 10, 2018.[2]

On June 8, 2018, Father appealed and simultaneously filed a <u>Concise Statement of Matter Complained of Pursuant to Pa. R.A.P. 1925 (b)</u>. Appellant identifies several alleged errors,

> 1. The Lower Court erred as a matter of law finding that the Appellant herein was a perpetrator of emotional abuse because:
>     A. Two Petitions of Dependency were filed against the Appellant herein, and neither raised the issue of emotional abuse.
>
>     B. During the course of the proceedings, the issue of "emotional abuse" arose sua sponte by the Court, but all parties on the record agreed that no emotional abuse issue was part of this proceeding.
>
> 2. The Lower Court erred as a matter of law or abused its discretion in its Order of May 10, 2018, finding the Father, Justin Abel, was given notice of the Agency's intention to pursue a finding of emotional abuse.
>
> 3. The Lower Court erred as a matter of law or abused its discretion in its Order of May 10, 2018, that the Child was dependent.

---

[2] Father, Justin Abel, is the Court Appointed Mental Health Attorney for Cumberland County. Accordingly, the Cumberland County Court of Common Pleas recused itself, and Appointed the undersigned to preside over the case.

4

4. The Lower Court erred as a matter of law or abused its discretion in denying the Motion to Release the Child from Shelter Care custody. The Lower Court erred as a matter of law or abused its discretion in making a determination that the Child was emotionally abused by the Father, Appellant herein, when it was expressly noted on the record that the issue of "emotional abuse" was not part of the proceeding.

5. The Lower Court erred as a matter of law or abused its discretion in that the Court declared that the Dependent was not subject of physical abuse and the Court declared that the Child was not subject of inappropriate suggestions from the Father, as contained in each of the two Petitions, then on its own determined that the Child was the subject of emotional abuse when there was no record of same.

Statement of Errors Complained of on Appeal. The court hereby reaffirms its Findings, and Order of Adjudication and Disposition of May 10, 2018, as discussed below.

## DISCUSSION

The standard of review in dependency cases is abuse of discretion.

As the Superior Court stated, the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 9 A.3d 1179, 1190 (PA. 2010) (internal citations omitted).

1. Father first alleges that this Court erred in finding that Father was a perpetrator of emotional abuse because the issue of emotional abuse was not raised

5

by the dependency petition, and claims that the issue of emotional abuse was only raised *sua sponte*. This is factually inaccurate. The Amended Dependency Petition filed December 6, 2017 alleges that the child is a victim of child abuse as defined at 23 Pa.C.S. §6303. The statute states *inter alia*,

> (b.1) Child abuse.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> (2) Fabricating, feigning or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act.
>
> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

23 Pa.C.S.A. § 6303(b.1). The statute clearly includes provisions for mental injury, which we take to be synonymous with emotional abuse. The dependency petition alleges,

> The child:1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental, or emotional health, or morals....

Amended Dependency Petition at 3. While this may be standard boilerplate language, that fact would only further reinforce the notion that a person in Father's

6

position is on notice that the issue of emotional abuse is, in fact, before the court. Appellant Father strongly protests that emotional abuse was raised sua sponte, but it was clearly raised by the Amended Dependency Petition of December 6, 2017. The fact that Father chooses to interpret the word "abuse" to mean only physical abuse does not override the legislature's clear intent to include mental and emotional abuse within the definition of abuse.

Further, the record clearly indicates that mental and emotional abuse were a concern from the outset of the CYS investigation. The CYS solicitor questioned psychologist Dr. Valentines Krecko:

> Q: Dr. Krecko, you were asked in September of 2017 evaluate [L.J.A.] with an eye toward whether there was, perhaps, I think it was emotional, well, you tell us. Was it for emotional abuse with the potential for coaching?
>
> A: My evaluation was geared toward determining whether [L.J.A.] suffered mental injury due to the contentious custody battle between her parents.

Hr'g Tr. 28. February 14, 2018. Dr. Krecko would go on to testify that he tested L.J.A. for emotional abuse on September 21, 2017. Id. at 32. He found none at that time. He evaluated her again on January 4, 2018, and came to a different conclusion, "My conclusion as of January 4th was that—I'm reading this now.

7

[L.J.A's] emotional and behavioral functioning show clear evidence of serious mental injury...." Id. at 34.

Father's counsel claimed surprise at the February hearing, because he claimed he had not had opportunity to review Dr. Krecko's report of January 4th. We recognize that there is some validity to that objection. However, all parties were equally surprised by Dr. Krecko's report, and thus there was no unfair or prejudicial surprise. Additionally the adjudicatory hearing was extended, to include a full day in April and a full day in May. Thus, all parties had adequate opportunity to review the report, call Dr. Krecko for cross-examination and provide argument to the contrary.

The issue of emotional abuse did not arise *sua sponte*, but as the CYS solicitor stated, "As we all recall during testimony, additional information came out triggering an emotional abuse investigation." Id. at 37. At the December hearing, the Court heard testimony that Lilian had displayed "troubling aggression," and as a result Dr. Krecko expressed "that she is experiencing evidence of serious mental injury," and "is at high risk for future psychological problems, especially if the conflict between her parents continues." Hr'g Tr. at 61 (Dec. 7, 2017). Clearly, the issue of emotional abuse was at issue from the beginning of and throughout the proceedings. Father cannot claim that he was not

8

on notice that emotional abuse was at issue during the proceedings when the record clearly indicates otherwise. Accordingly, we reaffirm.

As to the second issue, we incorporate the above discussion and add, that we agree with CYS that they "do not have to include every potential indication of abuse in this hearing." The petition for dependency need only specify whether the protective Agency seeks a finding of abuse. The petition need not specify which of the several types of abuse defined by the statute is suspected. Nonetheless, Father clearly was on notice as the record is replete with references to allegations of coaching and suspected emotional and mental abuse.

As to the third alleged error, we reaffirm our finding that the child was and is dependent. Again,

> As the Superior Court stated, the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 9 A.3d 1179, 1190 (PA. 2010) (internal citations omitted). We gave great weight to Dr. Krecko's analyses and opinions, including his statement that, "In my medical opinion, father should be charged with child abuse in the form of

9

inflicting serious psychological injury to [L.J.A.]." Hr'g Tr. at 38 (Feb. 14, 2018).
We also gave great credence to his observation that,

> In my 26 years of clinical experience, I have found that allegations of abuse that are made within the context of a custody evaluation must be viewed with a high degree of suspicion and that continued allegations of abuse can be detrimental to a child's mental health.

Hr'g Tr. at 54-55. (Dec. 7, 2017). As stated above, Father acknowledged that he made a multitude of referrals to CYS alleging that Mother abused L.J.A. All of the referrals were properly investigated and deemed unfounded, save for one. That referral, however, did not lead to a finding that Mother had abused the child. Quite the contrary. Mother produced evidence, in the form of photographs, showing L.J.A. without bruises moments before she left Mother's home for school. This, of course, begged the question of why Mother would be taking such pictures. Mother testified, credibly and convincingly, that law enforcement had suggested she do so, because of Father's repeated reports to CYS and law enforcement that Mother was abusing the child.

Mother's testimony on this point was reinforced by the testimony of Officer Lane Pryor of the Camp Hill Police Department. Officer Pryor testified, *inter alia,* that he had received a call from Father on June 24, 2017. Father related to Officer Pryor that L.J.A. had used a "safe word" during a telephone call. Father had taught L.J.A. to use the safe word, actually a phrase, to signal to him that Mother was

10

hitting or otherwise abusing her. Curiously, Father insisted that the officer *not* visit Mother's residence to ensure that the child was safe. Rather he stated that he had made the call for documentation purposes only. Hr'g Tr. at 10-11 (May 10, 2018). We find this extremely incongruous with the expected mind-state of a Father who suspects his child is being abused. Dr. Krecko testified that teaching a child to use code words in this manner creates a "climate of mistrust in the child where the child may fear that they cannot trust parents..." and "instills fear." Hr'g Tr. at 56 (Dec. 7, 2017). In this case, Father had taught the child to use code words to effectively create a climate of mistrust and fear of her Mother, when in fact, all of Father's attempts to have Mother deemed abusive had failed.

Regarding the back bruising that that the CYS caseworker, Ms. Nieves, witnessed, and that Father used as the grounds for another CYS referral, the child stated to the caseworker at the time that they had come from a fall on the playground. Father insisted that they were the results of mother hitting L.J.A. L.J.A would later tell Ms. Tanya Blough, effectively her paternal grandmother, that Father had lied, and that Mother had never hit her with a hammer. Hr'g Tr. at 81 (Dec. 7, 2017). Ms. Blough was so struck by L.J.A.'s disclosure that she reduced it to writing. CYS Exhibit 9. We found Ms. Blough to be extremely credible.

We found Father, on the other hand, to be extremely not credible. Father attempted to justify his multiple referrals to CYS and law enforcement as having

11

been made because he was, he claimed, a mandated reporter. Hr'g Tr. at 54 (May 10, 2018). He testified that as an assistant lacrosse coach for a local high school, he was mandated to report all suspected child abuse, and it was for that reason that he made the multitude of referrals. We are not convinced. Father is an attorney, trained in the law and licensed in the Commonwealth of Pennsylvania. As such, he knew or should have known that his duties as a mandated reporter were meant to protect the children he encountered during the course of his employment with the school. The duties clearly do not extend into his contentious custody battle.

Father further lost credibility when he testified that he had never sought primary physical custody of L.J.A. In fact, the Custody Complaint of August 8 2016, and the Petition for Modification of March 13, 2017 both seek primary physical custody. Hr'g Tr. at 130-32 (May 10, 2018). Father would attempt to say that the Complaint and Petition were the results of his lawyer not following directions. As Father is an attorney, and Father signed the Verification for both documents, we are forced to conclude that Father was not honest in his responses.

Finally, we find that Father was completely comfortable with attempting to mislead the court. He was, in fact, entirely incapable of be honest about his use of the pronoun "we." While describing points of frustration in the custody battle, Father made innumerable statements such as "we were extremely frustrated," "we sent Margaret an e-mail," and "we would receive an e-mail back." Id. at 111.

12

Clearly, the "we" in these contexts referred to Father and Stepmother. However, in an attempt to protect his wife Father insisted that the pronoun "we" referred to himself and his attorney.[3] We simply cannot believe that Father, an attorney himself, sits down with his lawyer to email his ex-wife about summer camp for L.J.A. Taken in the aggregate, we have no choice but to conclude that Father is simply not credible, and that he is more than willing to resort to dishonesty to further his goals.

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375.

> The Juvenile Act defines "dependent child" as follows, in relevant part. "Dependent child." A child who: (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.] 42 Pa.C.S.A. § 6302. In order to adjudicate a child dependent, the court must determine that the above definition has been met by clear and convincing evidence.

---

[3] Stepmother was also indicated in these proceedings, and a Finding of Abuse was entered against her as well. Stepmother sought to have her name removed from the case, stating that she is not a care-giver or acting as a parent. We disagree, and address that issue separately in Stepmother's appeal.

13

In re L.V., 127 A.3d 831, 835 (Pa. Super. 2015) (internal citations omitted). We do find by clear and convincing evidence that Father's conduct places the health, safety and welfare of the child at risk. Reading between the lines, it seems clear that Father has attempted to use law enforcement and CYS to create a mountain of documentation, which he intends to use as a weapon in the custody battle. He practically admitted as much in his call to Officer Lane. It is undisputed that L.J.A. is a boisterous and active child. It seems fairly evident that when L.J.A. came home from school with bruises she acquired on the playground Mr. Abel seized upon the opportunity and engaged in a course of action meant to further his goals in the custody dispute. It seems equally evident that Father has coached the child to go along with his fabricated theories. L.J.A. stated to her grandmother that Father had lied about her being hit with a hammer. During her C.A.C. interview, L.J.A. dutifully reported that the bruises on her back came from Mother hitting her with a hammer. The dots clearly connect to a conclusion that the child was coached. We reaffirm.

Regarding Father's fourth alleged error, regarding shelter care, we incorporate the above discussion. Additionally, we observe that Father blatantly misstates the situation. Our Order of May 10, 2018 states,

> She [L.J.A.} shall be discharged from the legal and physical custody of the Agency and her placement in the KidsPeace formal

14

> kinship foster home of her paternal grandfather, Mr. David Abel, effective 05/10/2018. She shall be returned to the physical custody of her mother, Ms. Margaret Murphy. Father, Mr. Justin Abel, shall have the right to periods of unsupervised visitation as stated below. She shall be placed in the shared legal custody of the Agency, Mr. Abel, and Ms. Murphy, effective 5/10/2018.
>
> Father shall immediately begin to enjoy unsupervised visits, and they may be made overnight, and they may even be made over a weekend, as the Agency may determine; however, they are not to go to 50/50 until further Order of Court. Father's contact need not be supervised.

Order of Adjudication and Disposition, at (2 May 10, 2018). Clearly, the child is not in shelter care. The Order was crafted thus to ensure that the best interests of the child were met, and in the least restrictive means possible. We are aware that the Superior Court "has stated strong disapproval of the use of a dependency proceeding as a means of transferring custody of a child from one parent to another." In re A.E., 722 A.2d 213, 215 (Pa. Super 1998). The decision to adopt this scheme of physical custody was based upon the Guardian ad Litem's valued opinion and well-reasoned preference that "…Father's time be expanded to include unsupervised time," and her statement that, "I don't know that it is appropriate for the parties to immediately resume their prior custody schedule, however." Hr'g Tr. at 151 (May 10, 2018).

Father's fifth issue has been addressed above.

15

As to Father's sixth alleged error, we adopt the reasoning given above, and add that we simply could not find by clear and convincing evidence that physical abuse had been perpetrated. Father's allegation of error on this point is not entirely clear, but he again seems to petition for a finding of abuse against Mother. As stated, Mother produced photographic evidence to support her claim that L.J.A. was not injured when she left Mother's home. Further, L.J.A. stated at the time of the injury that it came from a fall on the playground. There is simply no evidence, only Father's insistence that Mother perpetrated physical abuse.

Father alleges that this Court erred in that "...the Court declared that the Child was not subject of inappropriate suggestion from the Father...." This is inaccurate. As discussed above, we do find by clear and convincing evidence that L.J.A. was the subject of inappropriate suggestion.

## CONCLUSION

For the reasons indicated above, we find that Cumberland County Children and Youth Services did provide substantial evidence that L.J.A. was abused, as well as clear and convincing evidence that L.J.A. is a dependent child.

16

Accordingly, we reaffirm the Order of Adjudication and Disposition of May 10, 2018.

BY THE COURT,

N. CHRISTOPHER MENGES, JUDGE
YORK COUNTY COURT OF
COMMON PLEAS

**The Clerk of Court is directed to serve notice of the entry of this Opinion as required by law and rule of court.**

FILED
2018 JUL 13 PM 3: 25
CLERK OF COURT
CUMBERLAND COUNTY PA

## IN THE COURT OF COMMON PLEAS OF CUMBERLAND COUNTY, PENNSYLVANIA
## JUVENILE DIVISION

|  |  |  |
|---|---|---|
| **In the Interest Of:** | : | **CP-21-DP-0000124-2017** |
| **L.J.A., A Minor** | : | |
|  | : | **933 MDA 2018** |
|  | : | |
| **Appeal of: A.A., Stepmother** | : | |

## MEMORANDUM OPINION IN SUPPORT OF ORDER PURSUANT TO RULE 1925(a)(2)(ii) OF THE PENNSYLVANIA RULES OF APPELLATE PROCEDURE

**AND NOW,** this 6th day of July, 2018, the Court is in receipt of Appellant's statement of errors complained of on appeal, as required by the Rules of Appellate Procedure for a Children's Fast Track Appeal. Pa.R.A.P 1925(a)(2)(i). The Court hereby reaffirms its Order of Adjudication and Disposition of May 10, 2018,

1



adopts its Findings of the same day, as well as the Findings of September 7, 2017, and offers further discussion, below.

## HISTORY

L.J.A., six, is the natural born daughter of Justin Abel, (hereinafter "Father"), and Ms. Margaret Murphy ("Mother"). Appellant, A.A, is L.J.A.'s Stepmother ("Stepmother"). L.J.A. is also at the center of a contentious custody dispute which is the subject of litigation in Cumberland County, Pennsylvania. Between April and August of 2017, the Cumberland County Children and Youth Services Agency (CYS) received at least six referrals naming L.J.A. as a victim of abuse. Five specifically identified Mother as the alleged perpetrator; one identified someone with whom Mother associates as the alleged perpetrator. Father acknowledges having made the referrals. Five of the referrals were deemed unfounded. This appeal involves the sixth referral. On August 23, 2017, a CYS caseworker made a scheduled visit to see L.J.A. at Father's home. Present at the visit were Father, L.J.A., and Stepmother. At that time, the caseworker observed injuries on the child's back, which were described as "circular red marks." Dependency Petition ¶11 (Sept. 1, 2017). L.J.A. told the caseworker that she had fallen at daycare. However, Father and Stepmother insisted that the marks were not due to a fall. Interestingly, similar marks were at the center of prior referrals

2

indicating Mother, which the Agency investigated. Those referrals were deemed unfounded and the marks were found to be skin irritations. Hr'g Tr. at 53 (Feb. 14, 2018).

CYS received a referral three days later on August 26, alleging that Mother was not feeding L.J.A. Another referral was received four days later on August 30, claiming that L.J.A. had disclosed that the circular red marks on her back were caused by Mother hitting her with a hammer. The following day, Mother met with the CYS caseworker. The caseworker attempted to engage Mother in a safety plan, including supervised contact. Mother did not agree that a safety plan was necessary; she provided time-stamped photographs taken the morning of August 23, the day of the alleged hammer injuries, showing L.J.A. without injuries, minutes before going to before school care. Id. ¶¶14-15. When asked why she would take such photographs, Mother reported that doing so was suggested to her by law enforcement officers during previous investigations to prove lack of injury before custodial exchanges.

A shelter care hearing was held August 31, 2018 and L.J.A. was placed in foster care.[1] CYS filed a Dependency Petition September 1, 2017, citing concerns not only of where the red circular injuries had come from, but also about the very

---

[1] Apparently it is the custom in Cumberland County to record shelter care hearings and produce transcripts from the recordings as needed. Unfortunately, the recording of the shelter care hearing in the instant case was lost, and no transcript is available.

3

contentious custody situation, and whether Father and Stepmother were pushing the child to talk about inappropriate things and coaching her. Id. ¶¶16-17. An adjudicatory hearing was held before a hearing officer on September 7, 2017.

Kinship caregivers were identified, and L.J.A. was placed with her paternal grandparents. Four adjudicatory hearings were held before this court over the course of the next nine months before a determination of dependency and a finding of abuse were entered on May 10, 2018.[2]

On June 6, 2018, Stepmother appealed, filing a children's fast track appeal. However, the required Concise Statement of Matters Complained of on Appeal was not filed. Thus, we cannot address particular concerns. The court hereby reaffirms its Findings, and Order of Adjudication and Disposition of May 10, 2018, as discussed below.

## DISCUSSION

The standard of review in dependency cases is abuse of discretion.

> As the Superior Court stated, the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower

---

[2] Father, Justin Abel, is the Court Appointed Mental Health Attorney for Cumberland County. Accordingly, the Cumberland County Court of Common Pleas recused itself, and Appointed the undersigned to preside over the case.

court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 9 A.3d 1179, 1190 (PA. 2010) (internal citations omitted). All determinations regarding dependency and abuse were findings of fact, which were largely influenced by determinations of credibility.

Stepmother has long disputed her role in these proceedings, claiming that she ought not to be named in the dependency petition, because she is not a biological parent or legal guardian of the child. The Juvenile Act is clear in its intent to apply to more classes of persons than just parents,

> A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk....

42 Pa.C.S.A§ 6302. We find with absolute certainty that Stepmother falls into the category of "other custodian." Father testified that it was Stepmother who first noticed the injuries which were at the center of the final referral to CYS. Hr'g Tr. at 58 (May 10, 2018). Stepmother prepared L.J.A.'s meals. Id. Stepmother was present and participating along with Father during the CYS visit to the home. Id. at 60. Stepmother attended Back to School Night, and registered L.J.A. for the after-

5

school-care program. On August 30, 2017, Father sent an email to the school with instructions to release L.J.A. to Father or Stepmother, only; not to Mother. Stepmother clearly falls within the category of "other custodian." Thus, CYS's inclusion of Stepmother in the dependency petition was proper. It seems then, that only two issues remain which could form the basis of Stepmother's appeal: the finding of abuse and the finding of dependency. We address them in turn.

The Amended Dependency Petition filed December 6, 2017 alleges that the child is a victim of child abuse as defined at 23 Pa.C.S. §6303. The statute states *inter alia*,

> (b.1) Child abuse.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> (2) Fabricating, feigning or intentionally exaggerating or inducing a medical symptom or disease which results in a potentially harmful medical evaluation or treatment to the child through any recent act.
>
> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

23 Pa.C.S.A. § 6303(b.1). The statute clearly includes provisions for mental injury, which we take to be synonymous with emotional abuse. The dependency petition alleges,

6

> The child:1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his/her physical, mental, or emotional health, or morals....

Amended Dependency Petition as 3. We find that CYS produced clear and convincing evidence that L.J.A. is the victim of abuse. Dr. Krecko testified convincingly,

> Q: Dr. Krecko, you were asked in September of 2017 to evaluate [L.J.A.] with an eye toward whether there was, perhaps, I think it was emotional, well, you tell us. Was it for emotional abuse with the potential for coaching?
>
> A: My evaluation was geared toward determining whether [L.J.A.] suffered mental injury due to the contentious custody battle between her parents.

Hr'g Tr. 28. (Feb. 14, 2018). Dr. Krecko would go on to testify that he tested L.J.A. for emotional abuse on September 21, 2017. Id. at 32. He found none at that time. He evaluated her again on January 4, 2018, and came to a different conclusion,

> ...My conclusion as of January 4th was that—I'm reading this now. [L.J.A's] emotional and behavioral functioning show clear evidence of serious mental injury....

Id. at 34.

7

At the December hearing, the Court heard testimony that Lilian had displayed "troubling aggression," and as a result Dr. Krecko opined "that she is experiencing evidence of serious mental injury," and "is at high risk for future psychological problems, especially if the conflict between her parents continues." Hr'g Tr. 61 (Dec. 7, 2017). We also gave great credence to his observation that,

> In my 26 years of clinical experience, I have found that allegations of abuse that are made within the context of a custody evaluation must be viewed with a high degree of suspicion and that continued allegations of abuse can be detrimental to a child's mental health.

Hr'g Tr. 54-55. December 7, 2017. We find, by clear and convincing evidence, that L.J.A. is the victim of emotional abuse. Only the question of who perpetrated the abuse remains. We find, also by clear and convincing evidence that Father and Stepmother colluded in perpetrating emotional abuse.[3]

As stated above, Father acknowledged that he made a multitude of referrals to CYS alleging that Mother abused L.J.A. All of the referrals were properly investigated and deemed unfounded, save for one. That referral, however, did not lead to a finding that Mother had abused the child. Quite the contrary. Mother produced evidence in the form of photos showing L.J.A. without bruises moments

---

[3] Father was also found, on the record, in our Order of Adjudication and Disposition of May 10, 2018 to have been abusive. Father filed an appeal as well, to which we responded via Opinion on July 10, 2018.

before she left Mother's home for school. This of course begged the question of why she would be taking such pictures. Mother testified, credibly and convincingly, that law enforcement had suggested she do so, because of Father's repeated reports to CYF and law enforcement that Mother was abusing the child.

Mother's testimony on this point was reinforced by the testimony of Officer Lane Pryor of the Camp Hill Police Department. Officer Pryor testified, *inter alia,* that he had received a call from Father on June 24, 2017. Father related to Officer Pryor that L.J.A. had used a "safe word" during a telephone call. Father testified that he and Stepmother had taught L.J.A. to use the safe word, actually a phrase, to signal them that Mother was hitting or otherwise abusing her.

> We told her [L.J.A.] that if her mother was hitting her and she wanted to tell us about it, to use the phrase 'I don't like cheese, because it would be exactly opposite of what she does.

Hr'g Tr. at 82 (May 10, 2018). And,

> We also instructed her that if she had been hurt, I believe, to let us know, or, I am sorry, instruct is the wrong word. We asked her if she wanted to let us know that she had been hurt to tell us that she liked shrimp, because she hates it....

Id. at 83. Curiously, Father insisted that the officer *not* visit Mother's residence to ensure that the child was safe. Rather, he stated that the call had been for

9

documentation purposes only. Id. The solicitor for CYS questioned Father on this topic,

> Q: And yet when you heard these code words from her, you instructed the police not to check on her?
>
> A: We did.
>
> Q: Why?
>
> A: The reason we did was it was late at night. I believe it was about, I think Officer Pryor testified it was 8:51 in the evening. [L.J.A.]'s bedtime as far as we knew was 8:00, so they would have to wake her up. The other thing that concerned us at that time was that these, [L.J.A.] had told us on a Saturday, and we were concerned that if Officer Pryor approached Margaret and these things were actually happening, that there was a possibility that further harm could come to [L.J.A.} on Sunday, the full day of Sunday, and then Monday morning as well, as we were concerned that that might happen.
>
> Q: But you weren't concerned enough for him to go out and check on her?
>
> A: I think that's an oversimplification. We were scared. We were scared sick, however, we were concerned that [L.J.A.] would not be removed from the house, and that further abuse, there was a potential for further harm, and so rather than risk that, we instructed him to make is as a documentary only.

We find this extremely incongruous with the expected mind-state of a Father who suspects his child is being abused. Further, we find Father's continued use of the pronoun "we" to be extremely telling. Clearly, Father and Stepmother are working in concert. Father's testimony makes it clear that Stepmother is taking part

10

in the decision making process throughout the Abels' interactions with CYF and law enforcement.

Dr. Krecko testified that teaching a child to use code words in this manner creates a "climate of mistrust in the child where the child may fear that they cannot trust parents..." and "instills fear." Hr'g Tr. at 56 (Dec. 7, 2017). In this case, Father and Stepmother had taught the child to use code words to effectively create a climate of mistrust and fear of her Mother, when in fact, all of the Abels' attempts to have Mother deemed abusive had failed.

Regarding the back bruising that that the CYS caseworker, Ms. Nieves, witnessed, which formed the grounds for another CYS referral, the child stated to the caseworker at the time that they had come from a fall on the playground. L.J.A.'s teacher testified that L.J.A. did not seem to be in pain on the date in question, nor did she express being in any pain or discomfort. Hr'g Tr. (April 18, 2018). The before and after school care providers testified to the same. Yet, Father and Stepmother insisted that they were the results of mother hitting L.J.A.

During her C.A.C. forensic interview, L.J.A. did state that Mother had hit her with a hammer. She could not, however, describe or identify a hammer. Nor could she reproduce the likeness of a hammer. L.J.A would later tell Ms. Tanya Blough, effectively her paternal grandmother, that Father had lied, and that Mother had never hit her with a hammer. Hr'g Tr. 81 December 7, 2017. Ms. Blough was

11

so struck by L.J.A.'s disclosure that she reduced it to writing. CYS Exhibit 9. We found Ms. Blough to be extremely credible. Thus, it seems obvious that the child was coached.

Father attempted to justify his multiple referrals to CYS and law enforcement as having been made because he was, he claimed, a mandated reporter. Hr'g Tr. at 54 (May 10, 2018). Although Father appears to be the primary actor, we find by clear and convincing evidence that Stepmother and Father acted in concert. While describing points of frustration in the custody battle, Father made innumerable statements such as "we were extremely frustrated," "we sent Margaret an e-mail," and "we would receive an e-mail back." Id. at 111. Clearly, the "we" in these contexts was Father and Stepmother. However, in an attempt to protect his wife Father insisted that the "we" referred to himself and his attorney. We simply cannot believe that Father, an attorney himself, sits down with his lawyer to email his ex-wife about summer camp for L.J.A. During the CYS visit Father stated, "We indicated that Lilian had come home again with marks...," Stepmother was the only other person present during the visit. Thus, Stepmother was clearly included in the "we," not Father's attorney. Hr'g Tr. at 60 (May 10, 2018).

When asked about actions taken following the discovery of the bruises, but before L.J.A.'s entrance into shelter care, Father stated

12

...we had contacted [L.J.A.'] pediatrician, we had contacted other independent medical, other independent medical practitioners for advice, and contacted and actually e-mailed Jenna to find out what we should do, and contacted Children & Youth Services, what we should do with these marks"

Id. at 62. The record is rife with such examples. It is clear the Stepmother and Father acted in concert to make multiple allegations of abuse against Mother.

Our finding of dependency follows naturally from our finding of abuse. Thus, we will not repeat the rationale, but do adopt the preceding discussion herein. Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375.

The Juvenile Act defines "dependent child" as follows, in relevant part. "Dependent child." A child who: (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other

13

custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.] 42 Pa.C.S.A. § 6302. In order to adjudicate a child dependent, the court must determine that the above definition has been met by clear and convincing evidence.

In re L.V., 127 A.3d 831, 835 (Pa. Super. 2015) (internal citations omitted). We do find, for the reasons stated above, by clear and convincing evidence that Stepmother's conduct places the health, safety and welfare of the child at risk. It is clear that Father and Stepmother colluded to use law enforcement and CYS to create a mountain of documentation to use as a weapon in the custody battle. Father practically admitted as much in his call to Officer Lane. Again, throughout his testimony regarding that call, Father described all actions and decision making as having been done by "we," Father and Stepmother.

It is undisputed that L.J.A. is a boisterous and active child. It seems fairly evident that when L.J.A. came home from school with bruises she acquired on the playground, Father and Stepmother seized upon the opportunity and engaged in a course of action meant to further Father's goals in the custody dispute. It seems equally evident that the child was coached to go along with their fabricated theories. Accordingly, we reaffirm.

14

## CONCLUSION

For the reasons indicated above, we find that Cumberland County Children and Youth Services did provide substantial evidence that L.J.A. was abused, as well as clear and convincing evidence that L.J.A. is a dependent child. Accordingly, we reaffirm the Order of Adjudication and Disposition of May 10, 2018.

BY THE COURT,

N. CHRISTOPHER MENGES, JUDGE
YORK COUNTY COURT OF
COMMON PLEAS

**The Clerk of Court is directed to serve notice of the entry of this Opinion as required by law and rule of court.**